NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ETHICAL FACTOR RX, LLC, | : | |
| Plaintiff, | : | **Civil Action No. 25-08834 (SRC)** |
| v. | : | **OPINION** |
| HORIZON HEALTHCARE OF NEW JERSEY and HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, | : | |
| Defendants. | : | |

**CHESLER**, District Judge

This matter comes before the Court on Defendants Horizon Healthcare of New Jersey, Inc. and Horizon Blue Cross Blue Shield of New Jersey's ("Defendants" or "Horizon") motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56.  (Dkt. No. 36, "Motion"). Plaintiff Ethical Factor Rx, LLC ("Plaintiff" or "Ethical Factor") filed a brief in opposition to the Motion.  (Dkt. No. 40, "Opp."). Defendants then filed a brief in reply.  (Dkt. No. 44, "Reply"). The Court has reviewed the papers submitted and proceeds to rule without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, Defendants' Motion is **GRANTED.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The instant dispute arises out of Horizon's denial of Plaintiff's application to be admitted into Horizon's list of providers for hemophilia patients on Medicaid ("Hemophilia Network") and thereby become an in-network provider for Horizon-insured individuals with hemophilia.

Plaintiff is a Pennsylvania-based specialty pharmacy that services patients with chronic illnesses, including hemophilia.  (Dkt. No. 8, Amended Complaint ("AC") ¶¶ 14-15).  Horizon sells insurance policies that provide coverage benefits, and allows its subscribers to receive medically necessary services, including medications, from health-care providers and pharmacies which are either classified as in-network or out of network.  In-network providers have contracts with Horizon to provide services to insured subscribers at specified rates of reimbursement.  (Id. ¶¶ 17-20).  Horizon also maintains its Hemophilia Network, which is a specific network of providers for hemophilia patients on Medicaid.  (Id. ¶ 25).  Plaintiff has been an in-network provider for Horizon's general New Jersey Medicaid network since 2015, but it is not, and never has been, part of its Hemophilia Network.  (Id. ¶ 29).

In its verified Amended Complaint,[1] Plaintiff told a story which began in 2023, and described, in detail, a sequence of events which formed the basis of its legal claims against Horizon.  In its own words:

> In 2023, Ethical Factor was approached by certain potential customers who were Horizon insureds and beneficiaries of the New Jersey Medicaid program that Horizon administers.  Those insureds requested that Ethical Factor provide the hemophilia medications

---

[1] The Amended Complaint was verified by Plaintiff's CEO, Lisa Tomcykoski, who signed a verification affidavit stating that, "I verify, pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America that the factual averments in the foregoing Amended Complaint concerning are, to the best of my knowledge as of the date of this Verification, true and correct."  (AC at 28).  A verified complaint, sworn to its accuracy under penalty of perjury, typically has evidentiary value at the summary judgment stage.  See McKay v. Krimmel, 2023 WL 4231714, at *2 n.4 (3d Cir. June 28, 2023) ("A verified complaint may be treated as an affidavit with evidentiary value at the summary-judgment stage.").

they require and they sought all of the additional services Ethical Factor provides. Upon receipt of these requests, Ethical Factor contacted Horizon . . . [and] requested full admission into Horizon's Hemophilia Network.

Horizon's representatives repeatedly and consistently advised Ethical Factor representatives that, in order for Ethical Factor to participate as an "in-network" provider within its Hemophilia Network, Ethical Factor first needed to . . . obtain a "Hemophilia Home Care Provider" designation from DOBI (the "DOBI Designation").

Horizon representatives, such as Mr. Portalin [sic], promised Ethical Factor that if it secured the DOBI Designation it would be admitted into Horizon's Hemophilia Medicaid Network, as Ethical Factor already satisfied all other requirements for "in-network" pharmaceutical providers within the same.

Upon information and belief, Horizon representative Erin Keaveney ("Ms. Keaveney"), also repeatedly made similar promises to those of Mr. Portalin's [sic]—advising Ethical Factor that the only thing preventing Ethical Factor from admission into Horizon's Hemophilia Medicaid Network was its lack of a DOBI Designation. Upon information and belief, Ms. Keaveney represented that, with that Designation, Ethical Factor would experience no barriers to entry into Horizon's Hemophilia Medicaid Network and would be able to service both the insureds who had specifically requested Ethical Factor's services in 2023 as well as the other insureds within that network.

. . .

Over the course of approximately one year, Ethical Factor expended substantial time, resources and expenses to obtain from DOBI the designation as a Designated Hemophilia Home Care Provider, specifically so that it could gain admission into Horizon's Hemophilia Medicaid Network.

. . .

[O]n October 24, 2023, Ethical Factor obtained the DOBI Designation.

(Id. ¶¶ 34-39, 41, 43).  In short, Plaintiff's verified Amended Complaint avers that beginning in

2023, it received outreach from Horizon-insureds who wanted to use Plaintiff's services. It was

3

this outreach that then triggered the alleged promises of admission to the Hemophilia Network. And it was these promises that then triggered Plaintiff to expend approximately one year of "substantial time, resources, and expense" to obtain DOBI designation in October 2023.  (Id.).

Horizon ultimately rejected Plaintiff's request for admission into its Hemophilia Network. Horizon informed Plaintiff by email dated March 19, 2025, that it would not be admitted into the Hemophilia Network because, "Horizon's Network of Hemophilia providers is robust and sufficient for the current needs of Horizon's Medicaid enrollees. There is no need to add additional providers at this time, particularly a provider located 60 miles from the border of New Jersey." (Defendant's Statement of Undisputed Material Facts, "DSUMF," ¶ 22).

Plaintiff brought this action asserting claims for, among other things, promissory estoppel and tortious interference with prospective economic advantage.  (AC at 21-23).  Defendant moved to dismiss the Amended Complaint, and this Court heard oral argument.  The Court dismissed all others claims but allowed the parties to engage in limited discovery on those two claims. Discovery has ended, and Horizon now brings this Motion.

First, it has become clear through discovery that despite the allegations in Plaintiff's verified Amended Complaint that Portalatin promised admission into the Hemophilia Network in 2023, Portalatin retired from Horizon in April 2020, and passed away in August of 2022.  (DSUMF ¶¶ 1-2).  After Portalatin retired in 2020, Erin Keaveney took over Portalatin's role managing the Hemophilia Network.  (DSUMF ¶ 3).  In that role Keaveney apparently did not make any explicit promises to Plaintiff regarding admission to the Hemophilia Network.  (DSUMF ¶ 4; Ex. D to Jay Cert., 26:4–7, 193:3–4 ("Erin Keaveney never made the direct promise that we would become in the network," "My promise was from Peter, Erin never said specifically a promise.")).

4

During discovery, Plaintiff's CEO, Lisa Tomcykoski ("Tomcykoski"), who had sworn to the truth of the allegations in the Amended Complaint, moved the timeline on the allegations back a decade. Now, according to Tomcykoski's deposition and Plaintiff's opposition papers, Portalatin actually made the initial promise of admission to the Network in 2013. (Plaintiff's Supplemental Statement of Disputed Material Fact, "PSDMF," ¶ 1). Tomcykoski now claims that Plaintiff began taking action on that promise by preparing to apply for DOBI designation all the way back in 2014. (Id. ¶ 2). Further, Tomcykoski claims that not only did Portalatin make that initial promise in 2013, but that he continued to confirm that promise over the course of the next six years, through 2019, (Id. ¶ 1), and Keaveney, beginning in 2018, never disputed this promise during conversations with Plaintiff about admission to the Hemophilia Network. (Id. ¶ 3).

On October 24, 2023, Plaintiff obtained DOBI designation (DSUMF ¶ 15). At some point thereafter, Plaintiff applied for admission into the Hemophilia Network. (DSUMF ¶ 16; PSDMF ¶ 5).[2] On February 6, 2025, Plaintiff reached out to Horizon to inquire about the status of its application for admission into the Hemophilia Network. (DSUMF ¶ 16; Ex. H to Jay Cert.). Keaveney responded that same day, stating "[u]nfortunately, we are not looking to add any new Hemophilia providers." (Id.). On March 13, 2025, Plaintiff's counsel contacted Horizon and stated that Horizon had unreasonably delayed Plaintiff's admission into the Hemophilia Network. (DSUMF ¶ 20; Ex. M to Jay Cert.). Roughly a week later, on March 19, 2025, Horizon's in-house counsel informed Plaintiff's counsel that Horizon would not be admitting Plaintiff into the

---

[2] The parties disagree about when, precisely, Plaintiff applied for admission into the Hemophilia Network. Plaintiff argues, and Tomcykoski stated in her deposition, that Tomcykoski contacted Keaveney multiple times shortly after receiving DOBI designation, to seek admission. (PSDMF ¶ 5). Horizon argues, and Keaveney stated in her deposition, that Plaintiff waited until February of 2025 to reach out regarding admission into the network. (DSUMF ¶ 16). Neither existing claim depends on the exact timing of Plaintiff's application, so though this dispute is genuine, it is not material.

Hemophilia Network because the network was already "robust and sufficient" and that Horizon did not wish to add a "provider located 60 miles from the New Jersey border." (Id.). Additionally, Horizon expressed concern about Plaintiff's recent conduct, which is explained below. (Id.).

While the dispute about admission to the Hemophilia Network was ongoing, the parties were also having a related dispute over the provision of certain medications to three Horizon-insured Hemophilia patients: an adult patient, S.L. and two pediatric patients, Z.H. and Q.H., who are brothers.

On February 6, 2025, Tomcykoski called Horizon to reach out about Horizon-insured patient S.L.'s medication, Hemofil M. When Keaveney learned of this phone call, she told her Horizon colleagues via email, "I'll handle this. This is a Hemophilia Medication." (Ex. 7 to Swichar Cert.). According to Tomcykoski, she then spoke with Keaveney and informed her that S.L. wanted to fill their Hemofil M prescription with Plaintiff, and she reminded Keaveney of Portalatin's promise of admission into the Hemophilia Network. Keaveney did not dispute the promise and said that she would discuss it with her boss, Sam Currie ("Currie"). (Opp. at 12). Tomcykoski also claims that over the next few days, she and Keaveney had several conversations regarding Plaintiff's admission into the Hemophilia Network. (Id.). These conversations culminated in Keaveney asking Plaintiff for additional background information on its ability to serve Hemophilia patients, to which Plaintiff responded with a 90-page "package" of information. (Ex. 1 to Swichar Cert. at 126:1–131:23). Ultimately, this package was never discussed with Currie. (Id.).

Then, on February 28, 2025, S.L. had a bleed and contacted Plaintiff for an emergency fill of Hemofil M. Plaintiff filled that prescription, despite not being in the Hemophilia Network. (Ex. 5 to Swichar Cert.). On March 4, 2025, Tomcykoski emailed Keaveney to: (1) inform her

6

that Plaintiff had filled this prescription for S.L. after checking with other in-network pharmacies which Tomcykoski stated "did not have the medication in stock," and (2) reiterate Plaintiff's interest in joining the Hemophilia Network. (Ex. 11 to Swichar Cert.). This email apparently alarmed Keaveney enough that she reached out to two of the named in-network pharmacies. Those pharmacies stated they had no issues with their supply of Hemofil M or with their service of the relevant patients. (DSUMF ¶ 18; Exs. K and L to Jay Cert.).

On March 17, 2025, the mother of Horizon-insured pediatric patients Z.H. and Q.H. wrote a letter stating that her sons "currently treat with Nuwiq for their blood disorder . . ." and that she "would like [her] boys to use [Plaintiff]." (Ex. 24 to Swichar Cert.). The next day, Keaveney reached out to an in-network pharmacy, Infucare, to see if it had received cancellation notifications for Nuwiq for these two patients. It appears Keaveney then spoke on the phone with an Infucare representative about these patients. (Ex. 16 to Swichar Cert.). Though it is not entirely clear what was said on that phone call, it is clear from the record that at this point the patients had stopped filling their medication with Infucare. (See Ex. 18 to Swichar Cert.).

While Keaveney investigated Plaintiff's actions with respect to the three patients at issue, it appears she also directed Melissa Brooks ("Brooks"), Horizon's Manager of Pharmacy Network Integrity, to reach out the relevant doctors' offices to determine why the S.L., Z.H. and Q.H. had all cancelled their orders from in-network provider Infucare and to inform them that Plaintiff was not an in-network provider.

Memorializing her conversation with S.L.'s doctor's office, Brooks relayed what the representative at the doctor's office had told her: S.L. "'switched to Ethical Factor Pharmacy' & [the office] did not realize Ethical is not in network with [Horizon]" and that "Ethical told [the office] that they are in the middle of communicating w/DOBI." (Ex. 15 to Swichar Cert.). The

doctor's office also "thanked [Horizon] for helping to coordinate [S.L.]'s therapy because they were not aware of this issue." (Id.). Brooks also told the representative that it was "OK for MD to send Rx to Infucare" and "stressed that we wanted to be sure there was no interruption to the member's therapy." (Id.).

Brooks also memorialized her conversation with the doctor's office of pediatric patients Z.H. and Q.H.. Brooks "advised [the office] that Ethical is not contracted with [Horizon]" and she reported that "[the office] was not aware of this." Brooks also asked the office to send future prescriptions to in-network pharmacy Infucare. (Id.). A few months later, Brooks followed up on these two pediatric patients, and noted that "the mother was annoyed that they had to change to Infucare instead of [Plaintiff]" (Ex. 18 to Swichar Cert.), but a few weeks later learned that both patients had recently had prescriptions filled at another in-network provider, Accredo. (Ex. 19 to Swichar Cert.).

## II.   DISCUSSION

### a.  Legal Standard

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-movant on that fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material if, under substantive law, the dispute over that fact would affect the outcome of the suit. Id. In short, "[s]ummary judgment is appropriate only when no reasonable jury could find for the non-moving party." Burton v. Clinger, 2023 WL 4399221, at *1 (3d Cir. July 7, 2023).

In considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'" Tolan v. Cotton, 572 U.S. 650, 657 (2014) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  A court may not make credibility determinations or weigh the evidence. Anderson, 477 U.S. at 255.

Once the moving party has satisfied its initial burden, the nonmoving party must establish the existence of a genuine issue as to a material fact in order to defeat the motion. Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985).  To create a genuine issue of material fact, the nonmoving party must come forward with sufficient evidence to allow a jury to find in its favor at trial.  Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001), overruled on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs, 571 U.S. 177 (2014).  If a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," there is no genuine dispute of material fact and the motion for summary judgment should be granted.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party opposing a motion for summary judgment cannot rest on mere allegations contained in its pleading document; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248.

### b.  Analysis

#### i.  Promissory Estoppel

Plaintiff's verified Amended Complaint, sworn to its accuracy by Plaintiff's CEO Tomcykoski, alleged that Plaintiff acted to get its DOBI certification because of promises made by Portalatin and Keaveney in 2023 and later.  (AC ¶¶ 34-42).  The discovery conducted in this

case has, however, shown that these sworn factual allegations were totally unsupported. Accordingly, the Court will grant Defendant's motion for partial summary judgment on Count 1.

A claim for promissory estoppel has four elements: "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." Toll Bros. v. Bd. Of Chosen Freeholders of Cnty. of Burlington, 944 A.2d 1, 19 (N.J. 2008). Horizon essentially argues that summary judgment must be granted because Plaintiff has failed to establish a genuine dispute of material fact as to whether, in and after 2023, Portalatin and Keaveney made a series of promises to Plaintiff regarding admission to the Hemophilia Network. The Court agrees.

First, the Court looks to the alleged promises by Portalatin. The primary problem with Plaintiff's sworn allegations that it detrimentally relied on Portalatin's 2023 promises of network admission is that Portalatin died in 2022. (SUMF ¶ 1). So, of course, it is impossible that any such promises were made in or after 2023. Even accounting for Plaintiff's counsel's statement at oral argument that the reliance-inducing statements, "may have taken place a few months before . . . or a few months after" the time alleged in the Amended Complaint, (Dkt. No. 19 at 9:16–17), Portalatin retired from Horizon in March of 2020, *years* prior to any of the promises alleged in the verified Amended Complaint. (SUMF ¶ 2). At oral argument, the Court stated,

> But quite frankly, if, indeed, I find that there is no contested issue of fact about: A, that Mr. Portalatin, in fact, died in 2022, and [B,] retired in 2020, then this complaint, indeed, is deficient. It's as simple as that. And you will be able to get summary judgment on promissory estoppel.

(Dkt. No. 19 at 14:15–19). Now that limited discovery has concluded, it is clear to the Court that there is no contested issue of fact about Portalatin's retirement nor his death.

10

Faced with this, Plaintiff points to new and self-serving claims in Tomcykoski's deposition that Portalatin made various "promises" to her from 2013 to 2019 regarding admission to Horizon's Hemophilia Network.  This information, which would have been just as available to Tomcykoski at the time she signed the verified Amended Complaint, paints an entirely different picture than that which was initially alleged.

With respect to the alleged promises by Keaveney, Plaintiff faces a similar challenge.  In the verified Amended Complaint, Plaintiff alleged that Keaveney

> also repeatedly made similar promises to those of Mr. Portalin's [sic] . . . [and] represented that [with DOBI Designation] Ethical Factor would experience no barriers to entry into Horizon's Hemophilia Medicaid Network and would be able to service both the insureds who had specifically requested Ethical Factor's services in 2023 as well as the other insureds within that network.

(AC ¶ 39).  But, Tomcykoski's deposition testimony now tells a completely different story—one in which Keaveney had begun confirming or not disputing Portalatin's alleged promise as early as 2018, but did not, herself, make a direct and explicit promise.  (PSDMF ¶ 3; see Tomcykoski Dep. Tr., Ex. D to Jay Cert., 26:4–7, 193:3–4 ("Erin Keaveney never made the direct promise that we would become in the network," "My promise was from Peter, Erin never said specifically a promise.")).

Rather than merely modify a date or change a minor detail from its initial allegations, Plaintiff's new story completely eviscerates the sworn-to causal chain of events laid out by the Amended Complaint, which began with patient outreach in 2023.  (See supra at 2-3).  In short, Plaintiff attempts to functionally amend its verified Amended Complaint through its opposition to Plaintiff's summary judgment motion.  The Court will not allow it to do so here, where the facts ascertained in discovery explicitly contravene its sworn and specific allegations, and it has provided no reasonable explanation for this discrepancy.  See Waugaman v. City of Greensburg,

11

841 F. App'x 429, 433 (3d Cir. 2021) ("It is commonly accepted that a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") (quotations omitted); Hu v. City of New York, 2023 WL 3563039, at *3 (2d Cir. May 19, 2023) (affirming district court's grant of summary judgment where plaintiffs' assertions of a new factual theory at summary judgment "directly contradict[ed] the allegations in their amended complaint" and plaintiffs "failed to reconcile these discrepancies . . . .").[3]

### ii.    Tortious Interference with Prospective Economic Advantage

Plaintiff's second claim, and the other claim on which limited discovery was granted, is for tortious interference with prospective economic advantage.  This tort essentially "proscribes inducing a third party not to 'continue' a prospective relation.'" MacDougall v. Weichert, 677 A.2d 162, 174 (N.J. 1996) (citing *Restatement (Second) of Torts,* § 766B(a)).

Under New Jersey law, a plaintiff claiming tortious interference with prospective economic advantage must show: "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages." Varrallo v. Hammond Inc., 94 F.3d 842, 848 (3d Cir. 1996) (citing Printing Mart-Morristown v. Sharp Elecs. Corp., 563 A.2d 31, 37 (N.J.

---

[3] Additionally, there is a large body of law which allows Courts to disregard "sham affidavits" where affidavits submitted after deposition testimony directly controvert the previously submitted deposition testimony and the "party does not explain the contradiction between a subsequent affidavit and a prior deposition." Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 254 (3d Cir. 2007).  This principle, which ordinarily applies where a party submits an affidavit after a deposition, should apply with equal force where a party gives deposition testimony after providing a prior sworn complaint.  That is, where the later sworn statements contradict the prior sworn statements, the party in contradiction must provide a reasonable explanation.  Plaintiff has not done so here.  All of the information discussed in Tomcykoski's deposition regarding her communications with Horizon beginning in 2013 was in her possession at the time she signed the verified Amended Complaint, and it is not at all clear to the Court why it should allow Plaintiff's claims to proceed where it failed to plead information that would have clearly been available to it at the time of pleading.

1989)).  To be malicious, the harm at issue must have been inflicted "intentionally and without justification or excuse." Lamorte Burns & Co. v. Walters, 770 A.2d 1158, 1170 (N.J. 2001) (citation omitted).  In assessing malice, the defendant's conduct "must be both injurious and transgressive of generally accepted standards of common morality or of law."  Id. at 1170–71 (quotations omitted).

 Plaintiff's tortious interference theory appears to be predicated on two possible acts of interference.  First, Horizon's refusal to admit Plaintiff into the Hemophilia Network.  Second, Horizon's outreach to the doctors' offices of patients S.L., Z.H., and Q.H., wherein Horizon informed those doctors that Plaintiff was not in the Hemophilia Network and redirected them to an in-network provider.  (Opp. at 28).

Plaintiff's first theory—interference by non-admission into the Hemophilia Network—fails because it does not involve contact with a third party, and because refusal to enter into a contract with a plaintiff cannot generally form the basis of a tort claim by that plaintiff.  See Rothermel v. International Paper Co., 394 A.2d 860, 864 (App. Div. 1978), certif. den. 79 N.J. 487, 401 A.2d 242 (1979) (denying a tortious interference claim where defendant-manufacturer had refused to continue selling its product to plaintiff-middleman because the "right to refrain from contracting is an absolute right" and "[t]hat which one has a right to do cannot become a tort when it is done."); Innovation Optics, Inc. v. Corey M. Notis, M.D., P.A., 2025 WL 680080, at *6 (N.J. Super. Ct. App. Div. Mar. 4, 2025) ("A party's exercise of a right constitutes ample justification for its action and cannot result in the imposition of tort liability.").

Plaintiff's second theory of interference—placing phone calls to specific doctor's offices informing them that Plaintiff is not in-network for the relevant patients—comes closer, but because

13

Plaintiff fails to establish a genuine dispute of material fact as to malice, this theory also fails to survive summary judgment.

Plaintiff appears to argue that Keaveney, and therefore Horizon, engaged in dishonest behavior in the process of denying Plaintiff admission into its Hemophilia Network and in calling the two doctors' offices, which supports a finding of malicious interference. In Plaintiff's view, the following three facts establish malice: (1) that an email initially sent by Keaveney to Brooks memorializing a conversation between the two, which Brooks ultimately forwarded as part of an email chain to Currie, was edited at some point to exclude Keaveney's belief that Plaintiff had misled patients when it was forwarded to Currie; [4] (2) that Keaveney did not send Currie the 90-page package of background documents provided by Plaintiff to Keaveney in February 2025; and (3) that Keaveney investigated Plaintiff's behavior toward customers and ultimately concluded Plaintiff did not cause harm to patients. (Opp. at 29).

It is not clear, based on these assertions, why Plaintiff believes Horizon's conduct "transgress[ed] [] generally accepted standards of common morality or of law," nor does Plaintiff explain how the Court should understand them to create a genuine dispute of material fact as to whether Horizon acted with malice. Lamorte Burns & Co., 770 A.2d at 1170–71. To the extent Plaintiff wants this Court to make some sort of speculative inference about fraud, dishonesty, or, more likely, general ill-will, it will not do so, because the Court need only make *reasonable*

---

[4] Plaintiff makes much of the "alteration" of the underlying language in the email from Keaveney to Brooks, asserting that it shows a "cover-up" by Keaveney and "evidences Keaveney's malice" against Plaintiff. (Opp. at 15). But, in the Court's view, Plaintiff makes a mountain out of a mole hill here, and the Court credits Horizon's explanation that "the email that appears as Plaintiff's Exhibit 14 was a draft email, and when the draft was ultimately sent to Mr. Currie (Exhibit 15) changes were made to it." (Reply at 11 n.8). In any event, it is not obvious why the removal of language suggesting Keaveney had concerns about Plaintiff possibly misleading patients shows malice. If anything, in the Court's view, this fact would cut in the opposite direction—that even assuming Keaveney altered the language, it evinces a desire to not rush into accusing Plaintiff of engaging in nefarious or wrongful conduct without a full investigation.

14

inferences in favor of the non-movant. See Henn v. Nat'l Geographic Soc., 819 F.2d 824, 830 (7th Cir. 1987) (holding that the reasonable inferences to be made from the record would not allow a jury to find for the plaintiff, and stating "[i]n passing on a motion for summary judgment, a court must indulge inferences in favor of the non-moving party, but it need not indulge *all possible* inferences.") (emphasis added).

Horizon had a perfectly reasonable business rationale for rejecting Plaintiff's request for admission—that at the time of the application, Horizon had a sufficiently robust Hemophilia Network and did not need to add an additional provider, especially one that sat 60 miles outside of New Jersey—and it articulated that rationale to Plaintiff. (SUMF ¶ 22). Plaintiff has marshaled no evidence which tends to show Horizon acted with an ulterior, non-justifiable purpose, and Horizon's reasons for rejection do not come close to showing malice.

Even if Horizon's phone calls constituted interference, they were not malicious in that they were not "without justification or excuse," Lamorte Burns & Co., 770 A.2d at 1170, nor were they "fraudulent, dishonest, or illegal." Id. at 1171. Once again, Plaintiff cannot establish a genuine dispute of material fact as to Horizon's malice because it provides essentially no genuinely supporting evidence to that point. In the Court's view, Horizon's conduct is easily, and most reasonably, explained as re-directing patients to in-network providers to ensure their Hemophilia treatment would not be cost prohibitive. (See AC ¶ 20 ("In-network pharmacies have contracts with Horizon to provide services to insureds at specified rates of reimbursement.")). Given that without insurance Hemophilia medications can cost patients tens of thousands of dollars per month, (See AC ¶ 78 ("[T]he monthly cost per patient for hemophilia medication is approximately $40,000 to $80,000.")), Horizon's outreach to doctors' offices seems not only not malicious, but, in fact, particularly responsible.

**III.    CONCLUSION**

For the foregoing reasons, the Court will grant Horizon's motion for summary judgment on the two remaining counts in the Amended Complaint and this case will be closed.  An appropriate order will be filed.